Robert Verta and Caroline Verta v. Commissioner.
Verta v. Commissioner
Docket No. 65027.
United States Tax Court
T.C. Memo 1959-143; 1959 Tax Ct. Memo LEXIS 105; 18 T.C.M. (CCH) 632; T.C.M. (RIA) 59143; July 8, 1959
*105 Petitioners' farm was purchased and operated with the intention of making a profit. Held, the mere fact that the farm was also used as a residence and as the location for a manufacturing business does not preclude the deduction of losses incurred in the operation of the farm. Norman A. Peil, Jr., Esq., for the petitioners. Sheldon Seevak, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax against petitioners in the amounts of $1,181.44 and $1,948.68 for the years 1953 and 1954, respectively, together with additions to tax in the amounts of $584.16 and $631.78 for those years, respectively, for failure to file declarations of estimated tax and for substantial underestimates of tax. The question presented for decision is whether farm losses in the amounts of $3,636.57 for 1953 and $6,677.85 for 1954, which petitioners deducted on their returns for those years, were incurred in trade or business. Findings of Fact A stipulation of facts filed by the parties is incorporated herein by reference. Robert and Caroline Verta are husband and wife, residing at R.D. #1, Oxford, New Jersey. *106 Their joint income tax returns for the calendar years 1953 and 1954 were filed with the director of internal revenue at Newark, New Jersey. Robert will hereinafter sometimes be referred to as petitioner. Petitioner is a graduate engineer, having obtained a degree in chemical engineering from Newark College of Engineering in 1933. He married Caroline, a graduate biologist, in 1943. From the time of his graduation until 1948, when he established his own business, he worked for various chemical houses. In 1948, petitioner established a business for manufacturing and compounding wax compounds for precision castings in the steel and aircraft industries. The business was conducted in corporate form under the name of Bennett Products Co., Inc., and petitioners were at all times the sole stockholders and officers thereof. The business progressed poorly in the early years of operation. During the years 1948, 1949 and 1950, petitioner received income from that business in the amounts of $2,000, $2,080, and $2,400, respectively. In 1951, his income therefrom rose to about $10,000, and it increased further in subsequent years. Such income was received by him in the form of salary; and after *107 payment of such salary, the corporation was left with virtually no taxable net income. During the early years of the operation of the wax business, petitioner was forced to use accumulated savings to help support himself and his family. About the early or middle part of 1950, petitioner heard and read a great deal about money to be made in farming, particularly chicken farming, and he became interested in acquiring a farm to supplement his then meager income. He first purchased and read some books and pamphlets on farming. Petitioner was then residing in Hudson County, New Jersey. He consulted the agricultural agent in adjacent Bergen County, which appeared to be the nearest agricultural area. However, the agent discouraged the purchase of a farm in that county because prices of farms were out of line in view of the urbanization that the county was undergoing. Accordingly, petitioner visited a number of places elsewhere in New Jersey from 1950 to February of 1952 in his search for a farm. His objective was threefold: he sought a residence for himself and his family, he wanted a place where he could conduct the business of the Bennett Products Co., Inc. (which he was then able to *108 operate alone with very little outside assistance), and he wanted a farm that would be productive of income to supplement his income from the wax business. He found such a farm in February 1952 in Warren County, New Jersey, and purchased it shortly thereafter. It covered 56 acres, and included a dwelling, four chicken coops, six brooder coops, and a wagon barn. The real estate agent handling the property represented that a prior owner had made a living from the farm for 29 years. Petitioner had made calculations in the latter part of 1951 showing that an annual profit of $1,000 was obtainable from a flock of 500 chickens. The farm which he purchased had facilities for over 1,000 chickens. Petitioner paid $17,500 for the property, $10,000 in cash, and the remainder by mortgage note that was paid off within a year. Petitioner made several thousand dollars worth of improvements in the dwelling house, and he established the wax business in the wagon house. About a quarter of an acre was required for the wax business. The farm had no swimming pool, recreational facilities, hedges, or accommodations for guests. Petitioner moved to the farm near the end of March 1952. A few weeks later *109 the county agent, at petitioner's request, visited the farm and gave advice on the commencement of farming operations, including the care of fields. He also furnished pamphlets dealing with various aspects of farming. In the latter part of 1952, petitioner purchased two registered heifers at $150 each, and four ewes at $25 each. The ewes were purchased after discussion with at least one neighboring farmer, who had been successful in raising sheep. In 1952 petitioner hired a farmer, Edwin Price, to assist in clearing the land for spring planting which was planned for 1953. In January 1953, petitioner purchased 17 bred ewes for $400 and a registered prize Dorset ram for the purpose of upgrading the stock. On May 19, 1953 petitioner purchased 185 New Hampshire pullets costing $290, and on May 27, 1953 purchased 300 White Leghorn pullets and 50 New Hampshire pullets costing $112.50. In 1953 he purchased a John Deere tractor with plow costing $1,900, and one Oliver wagon with attachments costing $194.04. In 1954 he purchased a chain saw at a cost of $289.10. During 1953 about 14 acres of petitioners' land was cultivated in hay and another 16 acres were used as a pasture for the *110 sheep. There was no acreage in lawn. In 1953 petitioner became a stockholder in a farmers' co-operative. Ownership of stock in that co-operative was limited to persons engaged in farming. Early in 1953 petitioners opened a checking account in the First National Bank of Washington, New Jersey, under the name of "Lazy Day Farm". Specially printed checks bearing the designation "Lazy Day Farm" were used in connection with the account, and either of the petitioners was authorized to sign the checks. The account was opened in order to keep petitioners' farm income and expenses separate from their personal expenses, and petitioners kept separate records of their farm income and expenses. In 1952 or 1953 petitioner had stationery printed bearing the designation "The Verta's Lazy Day Farm, R.D. #1, Karrsville, Oxford, New Jersey." This stationery was used in order to put the farm operation on a businesslike basis. During the taxable year 1953 petitioners received income from the sale of eggs of $354.56 and from the sale of wool of $77.35. In 1953 petitioners applied for and received farm plates from the State of New Jersey for the tractor which they had purchased. In order to receive *111 these it was necessary for them to obtain a certificate from the Agricultural Department of Warren County, certifying that they were entitled to receive farm plates. The fee for farm plates was $1.00 a year, whereas the fee for registering an automobile in New Jersey was between $13 and $15. A number of petitioners' chickens became ill. Late in 1953 or early in 1954 the illness was diagnosed as leucosis. Petitioner attempted to study about the disease in books that were available to him and found that there were no known control measures. After consultation with a member of the New Jersey Agricultural Department, and after half of the flock had died, petitioner in 1954 sold the remaining chickens. In 1954 after selling the chickens, petitioner destroyed the two coops in which the chickens had been housed, because from his reading he felt that the disease was caused by bacteria and that it might not be possible effectively to destroy the bacterial spore that were lodged in the coops. He took such action after discussing the matter with his wife, who, as noted, was a graduate biologist. During the period of petitioner's ownership of the chickens he marketed eggs through the Flemington *112 Auction Market Co-operative Association, Inc. In 1954 petitioners received $673.16 from the sale of eggs, $52 from the sale of chickens, $63 from the sale of wool, and $300 from the sale of two cows. During the years 1953 and 1954, petitioner belonged to the Farm Bureau, the New Jersey Sheep Breeders Association, The Flemington Auction Market, and a cattle association. Petitioners subscribed to the "Farm Quarterly", "The Farm Journal", "Everyday Poultry", and "Rural New Yorker". Petitioner purchased a book on the breeding and developing of farm animals and also a book written by an Australian authority, entitled "Breeding and Raising Sheep". These publications were used mainly for reference. Petitioner purchased the farm and operated it in 1953 and 1954 with the bona fide intention of making a profit therefrom. Petitioners did not file declarations of estimated tax for the taxable years 1953 and 1954. Such failure to file declarations was not due to reasonable cause. Opinion RAUM, Judge: The principal issue is one of fact that has been resolved by our findings. We are fully satisfied on the evidence that petitioner in good faith purchased the farm with the intention of *113 operating it at a profit. To be sure, he also wanted it as a place of residence and as a location for his wax business. But these were not mutually exclusive objectives, and it is clear to us that one of his purposes was to engage in farming as a business. The farm plainly was not a hobby. The amounts of the losses in question are not in dispute and are therefore deductible. Petitioners raise no separate issue as to the additions to tax growing out of their failure to file declarations. In view of our decision on the principal issue, the extent to which such additions must be approved can be determined under Rule 50. Decision will be entered under Rule 50.